UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
DAVID ALLEN and ASHLEE ALLEN, individually
and as guardians ad litem for XAVIER ALLEN,
an infant; VAUGHN ALDREDGE and KARINA
ALDREDGE, individually and as guardians ad litem for
 MATISSE ALDREDGE, an infant; BRIAN BULLEN
and REBECCA BULLEN, individually and as guardians
ad litem for WILLOW BULLEN, an infant; DAN
CHARLEY and KARY CHARLEY, individually and as
guardians ad litem for JAKE CHARLEY, an infant;
SCOTT KRAMER and TOVAH KRAMER,
individually and as guardians at litem for JULIA
KRAMER, an infant; STUART LAZARUS and
JENNIFER LAZARUS, individually and as guardians ad
litem for BENJAMIN LAZARUS, and infant; JOHN
McEVOY and SONYA McEVOY, individually and
as guardians ad litem for TILDA McEVOY, an infant;
FRANK McLAUGHLIN and JULIE McLAUGHLIN,
individually and as guardians ad litem for LUCY
McLAUGHLIN, an infant; BO MITCHELL and
CHASTITY MITCHELL, individually and as guardians
ad litem for PARKER MITCHELL, an infant; JASON
MOCHI and TONI MOCHI, individually and as
guardians ad litem for BOSTON MOCHI, an infant;
RICHARD TONES and KELLY SVENDSEN,
individually and as guardians ad litem for OLIVIA
TONES-SVENDSEN, an infant;

        Plaintiffs,

    -against-

ROBERT's AMERICAN GOURMET FOOD, INC.,

        Defendant.
-------------------------------------------------------------------x

<u>REPORT AND
RECOMMENDATION</u>

CV 07-02661 (NGG) (ETB)

----------------------------------------------------------------------x

ROBERT's AMERICAN GOURMET FOOD, INC.

                    Third-Party Plaintiff,

      -against-

VAN DE VRIES SPICE CORP., individually and as
successor in interest, ATLANTIC QUALITY SPICE
 & SEASONINGS, a division of Van de Vries
Trading Corp., VAN DE VRIES TRADING CORP.,
d/b/a Atlantic Quality Spice & Seasonings, ATLANTIC
QUALITY SPICE & SEASONINGS, a division of
Van de Vries Food Corp., VAN DE VRIES FOOD
CORP., d/b/a Atlantic Quality Spice & Seasonings, and
WORLD SPICE, INC.,

                    Third-Party Defendants.

----------------------------------------------------------------------x

TO THE HONORABLE NICHOLAS G. GARAUFIS, UNITED STATES DISTRICT JUDGE:

Before the court are the motions of Plaintiffs David and Ashlee Allen, Vaughn and

Karina Aldredge, Brian and Rebecca Bullen, Dan and Kary Charley, Scott and Tovah Kramer,

Stuart and Jennifer Lazarus, John and Sonya McEvoy, Frank and Julie McLaughlin, Bo and

Chastity Mitchell, Jason and Toni Mochi, and Richard Tones and Kelly Svendsen, individually

and as guardians ad litem, for infants Xavier Allen, Matisse Aldredge, Willow Bullen, Jake

Charley, Julia Kramer, Benjamin Lazarus, Tilda McEvoy, Lucy McLaughlin, Parker Mitchell,

Boston Mochi, and Olivia Tones-Svendsen, respectively, (collectively referred to as

"Plaintiffs"), seeking approval of infant settlements with Defendant, and Third-Party Plaintiff,

Robert's American Gourmet Food, Inc., and Third-Party Defendants Van de Vries Spice Corp.,

Atlantic Quality Spice & Seasonings, Van de Vries Trading Corp., Atlantic Quality Spice &

Seasonings, Van de Vries Food Corp., and World Spice Inc. (collectively referred to as

"Defendants").  The terms of the proposed settlements arise from negotiation between the

parties. For the following reasons, I recommend that the Plaintiffs' motions be granted in part and denied in part.[1]

FACTS

Plaintiffs represent members of a class who contracted salmonellosis after consuming the snack food product "Veggie Booty," marketed by Defendant Robert's American Gourmet.

I. *Salmonella* Infections

*Salmonella* is a bacteria that lives in the intestinal tracts of humans and other animals and is usually transmitted by eating foods contaminated with human or animal feces. (Aff. Infant Allen's Reps., Ex. 4 at 2.) Symptoms of *Salmonella* gastroenteritis include "the sudden onset of nausea, abdominal cramping, and bloody diarrhea with mucous," and usually become visible within twelve to seventy-two hours after infection, lasting for approximately four to seven days. (2d Am. Compl. ¶ 3.3; Aff. Infant Allen's Reps., Ex. 4 at 2.) Infants, in addition to the elderly and those with immunodeficiency disorders, develop the most severe symptoms. (Aff. Infant Allen's Reps., Ex. 4 at 2.)

Since there is no cure for salmonellosis, most care is palliative. (Id.) Persons having diarrhea usually recover fully, though recovery can take months. (2d Am. Compl. ¶ 3.3.) However, continued medical treatment is necessary if a patient suffers from severe diarrhea and requires re-hydration, or the infection spreads to the intestines, necessitating the use of antibiotics. (Id.) A small number of patients with salmonellosis develop Reiter's syndrome, or

---

[1] The Court is grateful for the assistance of Andrew Des Rault, a summer intern and first-year law student at Cornell Law School, for his assistance in the preparation of this Report and Recommendation.

reactive arthritis, which can lead to pain in the afflicted person's joints, irritable eyes, and painful urination.  (Id. ¶ 3.4.)  None of the latter complications are present here.


II.    The Veggie Booty *Salmonella* Outbreak

Veggie Booty is a puffed rice and corn snack food, coated with vegetable spices, which is considered by parents to be a healthy alternative to potato chips and other processed foods marketed to toddlers.  (Aff. Infant Allen's Reps., Ex. 4 at 3.)  On June 28, 2007, Defendant Robert's American Gourmet, the manufacturer of Veggie Booty, recalled Veggie Booty products pursuant to a Center for Disease Control ("CDC") study implicating the manufacturer as the source of a recent S*almonella* outbreak.  (Id.)  In July 2007, the CDC, with the help of health officials in twelve states, tested sixty-one bags of Veggie Booty.  (Id. at 4.)  Eleven of the bags tested positive for *Salmonella* Wandsworth, and two other bags tested positive for four additional *Salmonella* serotypes.  (Id.)

From June 28, 2007 to August 21, 2007, the Food and Drug Administration inspected Third-Party Defendant Van de Vries' Edison, New Jersey location and determined that a spice utilized in making Veggie Booty was the source of the contamination.  (Id.)  A sample of the Veggie Booty spice blend tested positive for *Salmonella* Wandsworth.  (Id.)  A sample of parsley powder, an ingredient in the spice mix, provided by Third-Party Defendant World Spice Inc., also tested positive for *Salmonella* Wandsworth.  (Id.)

Between February 26, 2007 and September 6, 2007, seventy cases of *Salmonella* Wandsworth were identified in twenty-three states.  (Id.)  Ninety-three percent of the cases with *Salmonella* Wandsworth occurred in children ages ten months to three years and six of these

patients were hospitalized.  (Id.)  Ninety-eight percent of the cases reported eating Veggie Booty in the week prior to becoming ill.  (Id.)


III.     The Current Action

On July 2, 2007, Plaintiffs' David and Ashlee Allen filed a complaint, individually and as guardians ad litem for their infant son, Xavier Allen, against Defendant Robert's American Gourmet Food, Inc., for personal injuries stemming from their son's *Salmonella* infection. Plaintiffs requested damages for pain and suffering, loss of enjoyment of life, medical expenses, travel expenses, emotional distress, pharmaceutical expenses, and any other relevant damages. (Compl. ¶ 5.1.)  On May 21, 2008, Plaintiffs asserted a complaint against the Third-Party Defendants, (1st Am. Compl. ¶ 5.1), and, on January 30, 2009, joined ten additional infant plaintiffs, each of whom had similarly become ill shortly after consuming Veggie Booty.  (2d Am. Compl.)  The proposed settlement package for each infant includes either a structured settlement, consisting of several future periodic payments after reaching the age of majority, or one future lump-sum payment to be paid by World Spice Inc.'s insurer, the Hartford Life Insurance Company.  (Pl. Proposed Order Approving Settlement at 1.)   Each of the settlements also includes an up-front cash payment from the remaining Defendants to cover medical and out-of-pocket expenses.  (Id. at 2–3.)

Plaintiffs retained Marler Clark and Underberg & Kessler to represent their infant children, agreeing to a contingency fee of 25% of net settlement proceeds determined "after litigation costs or medical liens are deducted."  (Aff'm Supp. Infant Settlements ¶ 4 and the individual retainer agreements appended as Ex. 3 to the affidavits of each of the infants'

guardians.)[2] This fee reportedly represents a voluntary reduction from their standard fee of 33%. (Aff'm Supp. Infant Settlements ¶ 4.) Marler Clark "regularly litigates food-borne illness claims against major food producers, manufacturers, and/or retailers" and the firm claims to have developed "expertise that has taken over a decade to develop and is unique among law firms." (Id. ¶ 9.) Marler Clark's affirmations supporting the infant settlement are generally well-prepared, with certain exceptions noted below.

IV.    The Infant Plaintiffs

1.    Jake Charley

Jake Charley ("Jake"), then two and a half, was admitted to the emergency room ("ER") on April 22, 2007 after experiencing bloody diarrhea, vomiting, and severe abdominal cramps. (Aff. Infant Charley's Reps. ¶ 10 and Ex. 1, annexed thereto.) As a result of his *Salmonella* infection, Jake developed an intussusception - "a dangerous condition in which the bowels could have essentially telescoped on themselves" - which was treated with a barium enema. (Aff. Infant Charley's Reps. ¶ 11, Ex. 1.) On April 25, 2007, doctors began Jake on a "Bactrim suspension" which helped alleviate his diarrhea and allowed for his discharge on April 27, 2007. (Aff. Infant Charley's Reps., Ex. 1.) After his discharge, Jake's physician recommended that he "be kept at home for the next few weeks and monitored carefully." (Id.)

---

[2] The contingency fee agreement signed on behalf of Boston Mochi does not explicitly define "net settlement proceeds" as being "determined after litigation or medical liens are deducted" as do the agreements signed on behalf of the other infants. Instead, Boston Mochi's fee agreement states, "[t]he Client's net recovery will be the sum of money which remains from all amounts received . . . after the deduction of attorneys' fees (which will be subtracted first) and the further deduction of all unpaid costs and disbursements . . . ." (Aff. Infant Mochi's Reps., Ex. 3 at 1.) Despite this language, which suggests that attorneys' fees are to be calculated and deducted before all other costs, counsel has calculated attorneys' fees after deducting legal costs and expenses and the amounts paid in satisfaction of medical liens. (See infra at 12-13, discussing Boston Mochi's settlement package.)

By June 28, 2007, Jake developed bronchitis, and by July 3, 2007, a sinus infection. (Id.) X-rays also revealed that Jake suffered from a possible chest infection. (Id.) By July 6, 2007, as a result of antibiotic treatment, Jake began to "feel better." (Aff. Infant Charley's Reps. ¶ 16.) Jake's guardians believe that he has recovered fully and "no longer suffers from remaining disabilities related to the *Salmonella* illness." (Id.)

Defendants have agreed to settle Jake's claims for a gross amount of $125,110. (Aff'm Supp. Infant Settlement of Charley ¶ 10.) The settlement package includes $64,299.94 towards the purchase of an annuity for the benefit of Jake, $13,406 to Blue Cross of California in settlement of medical liens, $24,892.96 to Jake's guardians, Dan and Kary Charley, for out-of-pocket expenses and future care, $21,433.31 in attorneys' fees, and $1,078.49 as reimbursement for legal costs and expenses. (Id. ¶¶ 10–11.) The annuity is payable, commencing on Jake's nineteenth birthday, as follows: $30,000 on September 28, 2023; $50,000 on September 28, 2025; and $71,225.91 on September 28, 2027. (Id.) The rate of return, or implied discount rate, on the annuity is 5.23%.[3] (Id.)

2. Lucy McLaughlin

On or about June 9, 2007, Lucy McLaughlin ("Lucy"), then two years old, experienced "bloody diarrhea, abdominal cramping, fever, fatigue and dehydration" and was in "severe pain." (Aff. Infant McLaughlin's Reps. ¶ 10.) By June 10, 2007, Lucy's "bottom had become sore and rash-covered from . . . hourly bouts of diarrhea" and she suffered sleepless

---

[3] The rate of return for each annuity has been calculated for each infant using the "XIRR" function provided by the popular computer-based spreadsheet application, Microsoft Excel. In order to calculate a rate of return using this function, Excel requires the cash value of each annuity payment, the dates on which the future payments are made, and the present value of the annuity payments - all of which are included in the papers accompanying each infant's proposed settlement. Excel also requires the date on which the funds invested in the annuity will begin earning interest. For the above calculations, the start date of interest accrual is assumed to be September 1, 2009.

nights. (<u>Id.</u> ¶¶ 12–14.) Lucy's parents also became frustrated by frequent trips back and forth to the bathroom and the discovery of bloody stools. (<u>Id.</u> ¶ 14.) As a result of Lucy's illness, her mother, Julie McLaughlin, had to take time off from work, cancel Lucy's "play dates" with other children, and devote less attention to the needs of her other children. (Aff. Infant McLaughlin's Reps., Ex. 4 at 6.) Lucy's guardians believe that she has fully recovered from the *Salmonella* infection. (Aff. Infant McLaughlin's Reps. ¶ 16.)

Defendants have agreed to settle Lucy's claims for a gross amount of $21,290. (Aff'm Supp. Infant Settlement of McLaughlin ¶ 10.) The settlement package includes $14,627.93 towards the purchase of an annuity for the benefit of Lucy, $4,875.98 in attorneys' fees, $791.98 as reimbursement for legal costs and expenses, $395.10 to the Group Insurance Service Center in settlement of medical liens, and $599.01 to Lucy's guardians, Frank and Julie McLaughlin, for reimbursement of out-of-pocket expenses. (<u>Id.</u> ¶¶ 10–11.) The annuity is payable annually in the amount of $7,804.29, commencing on Lucy's eighteenth birthday, May 16, 2023, and ending on May 16, 2026, with a rate of return of 5.12%.[4] (Aff. Infant McLaughlin's Reps., Ex. 7.)

     3.    <u>Julia Kramer</u>

On June 24, 2007, Julia Kramer ("Julia"), then ten months old, started experiencing "bloody diarrhea, abdominal cramping, fatigue and dehydration." (Infant Kramer's Reps. ¶ 10 and Exs. 1-2, annexed thereto.) On July 29, 2007, Julia visited her pediatrician, Dr. Sharon Pollack, who instructed Julia's guardians to keep her hydrated. (Aff. Infant Kramer's Reps. ¶ 10.) By July 3, 2007, Julia's diarrhea began to subside. (<u>Id.</u>) Julia's guardians believe that she has fully recovered and that she suffers from no "remaining disabilities." (<u>Id.</u> ¶ 12.)

---

[4] The annuity which appears in the Plaintiffs' proposed Order Approving the Settlement of Lucy McLaughlin states an annuity payment date of June 16, 2023, which conflicts with the May 16, 2023 payment date stated above, and which also appears in the "Confirmation of Settlement" found in Exhibit 7, annexed to the Affidavit of Infant Lucy McLaughlin's Representatives.

Defendants have agreed to settle Julia's claims for $14,190. (Aff'm Supp. Infant Settlement of Kramer ¶ 10.) The settlement package includes $9,740.25 towards the purchase of an annuity for the benefit of Julia, $3,247.08 in attorneys' fees, $763.68 as reimbursement for legal costs and expenses, and $439 to Julia's guardians, Scott and Tovah Kramer, for reimbursement of out-of-pocket expenses. (Id. ¶¶ 10–11.) The annuity is payable annually in the amount of $5,521.64, commencing on Julia's eighteenth birthday, August 9, 2024, and ending on August 9, 2027, with a rate of return of 5.11%.[5] (Aff. Infant Kramer's Reps., Ex. 7.)

4.    Matisse Aldredge

On June 6, 2007, a "severely dehydrated" Matisse Aldredge ("Matisse"), then fifteen months old, was taken to the ER after experiencing diarrhea for five days and a fever for four to five days. (Aff. Infant Aldredge's Reps., Ex. 1.) It was noted that Matisse had lost six pounds, (Aff. Infant Aldredge's Reps. ¶ 12), and that he had developed a diaper rash. (Aff. Infant Aldredge's Reps., Ex. 1.) "[I]n distress with sunken eyes" and having "bloody streaks in his diarrhea," Matisse was hospitalized again on June 8, 2007, this time for three days. (Aff. Infant Aldredge's Reps. ¶¶ 15–16.) Matisse was briefly released from the hospital, but visited the ER for a third time on June 12, 2007, after unsuccessful attempts at hydration. (Id. ¶¶ 16–18.) After his final hospital visit, Matisse is considered to have recovered fully and has no remaining disabilities. (Id. ¶ 21.) Mattise's illness lasted approximately one month. (Id.)

Defendants have agreed to settle Matisse's claims for $85,210. (Aff'm Supp. Infant Settlement of Aldredge ¶ 10.) The settlement package includes $53,241.53 towards the purchase of an annuity for the benefit of Matisse, $17,747.18 in attorneys' fees, $975.90 as reimbursement

---

[5] Similarly, the annuity which appears in the Plaintiffs' proposed Order Approving the Settlement of Julia Kramer states an annuity payment date of July 13, 2024, which conflicts with the August 9, 2024 payment date stated above, and which appears in the "Confirmation of Settlement" found in Exhibit 7, annexed to the Affidavit of Infant Julia Kramer's Representatives.

for legal costs and expenses, $7,573.52 to Health Net in settlement of medical liens, and $5,671.88 to Matisse's guardians, Vaughn and Karina Aldredge, for reimbursement of out-of-pocket expenses. (Id. ¶¶ 10–11.) The annuity is payable annually in the amount of $30,168.17, commencing on Matisse's eighteenth birthday, February 16, 2024, and ending on February 16, 2027, with a rate of return of 5.18%. (Aff. Infant Aldredge's Reps., Ex. 7.)

5.      Olivia Tones-Svendsen

In April 2007, Olivia Tones-Svendsen ("Olivia"), then almost five years old, developed "issues with incontinence," which became worse in July 2007, prompting five medical examinations. (Aff. Infant Tones-Svendsen's Reps. ¶¶ 10–15 and Ex. 1, annexed thereto.) During her final visit, Olivia was prescribed Amoxicillin, which did not ameliorate her "severe pain," and on August 1, 2007, Olivia was admitted to the Children's Hospital in Vancouver where she received Ceftriaxone intravenously. (Aff. Infant Tones-Svendsen's Reps. ¶ 16.) Olivia finished intravenous treatment on August 4, 2007, and on August 10, 2007, she received additional antibiotics for urinary tract infections, which developed as a result of her salmonellosis. (Id. ¶¶ 18–19.) Olivia's incontinence subsided temporarily, but reemerged in November 2007, when she was diagnosed with cystitis, or inflammation of the bladder. (Id. ¶¶ 20–21.) Olivia's guardians believe that she has fully recovered and no longer suffers from any remaining disabilities related to her *Salmonella* illness. (Id. ¶ 23.)

Defendants have agreed to settle Olivia's claims for $85,210. (Aff'm Supp. Infant Settlement of Tones-Svendsen ¶ 10.) The settlement package includes $62,284.44 towards the purchase of an annuity for the benefit of Olivia, $20,761.48 in attorneys' fees, and $2,164.08 as reimbursement for legal costs and expenses. (Id. ¶¶ 10–11.) The annuity is payable commencing on Olivia's nineteenth birthday and will pay, in Canadian dollars, $30,000 on June

28, 2021, $50,000 on June 28, 2024, and $102,678.65 on June 28, 2026.  (Aff. Infant Tones-Svendsen's Reps., Ex. 7.)  The proposed annuity has a rate of return of 5.46%.[6]  (Id.)

      6.    <u>Xavier Allen</u>

On May 26, 2007, Xavier Allen ("Xavier"), then two and a half years old, visited the ER where he was diagnosed with a "viral illness with bloody diarrhea." (Aff. Infant Allen's Reps., Ex. 1.) After being released, "Xavier continued to suffer from diarrhea, cramping and fever," (Aff. Infant Allen's Reps. ¶ 10), and returned to the ER on July 13, 2007, where he was found to have a "mildly distended colon."  (Aff.  Infant Allen's Reps., Ex. 1.)  Xavier was released from the hospital that same day but on July 17, 2007, his guardians took him to the ER at Riley's Children's Hospital, where he was prescribed a two-week course of Ciprofloxacin and discharged.  (Aff. Infant Allen's Reps. ¶ 10.)  Xavier's guardians believe that he has recovered fully.  (Id. ¶ 12.)

Defendants have agreed to settle Xavier's claims for $56,790.  (Aff'm Supp. Infant Settlement of Allen ¶ 10.)  The settlement package includes $37,265.12 towards the purchase of an annuity for the benefit of Xavier, $12,421.70 in attorneys' fees, $2,077.93 as reimbursement for legal costs and expenses, $3,518.75 to Xavier's guardians, David and Ashlee Allen, as reimbursement for medical care, and $1,506 to Medicaid in settlement of medical liens.  (Id. ¶¶ 10–11.)  The annuity is payable, commencing on Xavier's eighteenth birthday, as follows: $20,000 on December 14, 2023; $30,000 on December 14, 2026; and $42,367.93 on December 14, 2028.  The rate of return is 5.39 %.  (Aff. Infant Allen's Reps., Ex. 7.)

---

[6]  The rate of return calculation assumes an exchange rate of 1.2956 Canadian Dollars per U.S. Dollar.  <u>See</u> Federal Reserve Bank of St. Louis' Economic Data portal, <u>http://research.stlouisfed.org/fred2/series/EXCAUS/downloaddata?cid=283</u> (providing historical Canadian dollar/US dollar exchange rates).

7.     Boston Mochi

On April 24, 2007, Boston Mochi ("Boston"), then fourteen months old, visited Dr. Karen Johnson after having diarrhea "for about a week." (Aff. Infant Mochi's Reps., Ex. 1.) Over the next few weeks, while his parents waited for his diarrhea to subside, Boston developed a diaper rash. (Aff. Infant Mochi's Reps. ¶ 10.) On May 21, 2007, Boston's mother, Toni Mochi, took him to see Dr. Daniel Brennan for his "15-month-old-checkup," during which time Dr. Brennan observed that Boston "seem[ed] to be doing very well." (Aff. Infant Mochi's Reps., Ex. 1.) However, Dr. Brennan also noted Boston's "history of loose stools over the past six weeks," (id.), and took a stool sample, which indicated a *Salmonella* infection. (Aff. Infant Mochi's Reps. ¶ 12.) On June 8, 2007, Boston had a fever of 102.1°F and was diagnosed with herpangina, "a viral illness marked by sores in the mouth." (Id. ¶ 13.) Dr. Gregory Gaitan suggested that the *Salmonella* infection may have weakened Boston's immune system. (Id.) On July 18, 2007, after having developed bloody stools and a rash, Boston visited the doctor for his final visit. (Id. ¶ 14.) Boston's guardians believe that he has recovered fully from his illness. (Id. ¶ 16.)

Defendants have agreed to settle Boston's claims for $49,690. (Aff'm Supp. Infant Settlement of Mochi ¶ 10.) The settlement package includes $36,523.90 to be held in trust at an "approved" banking institution,[7] which may be withdrawn by Boston on or after his eighteenth

---

[7] N.Y. C.P.L.R. § 1206 provides, in pertinent part:

> [T]he court may order that money constituting any part of the property be deposited in one or more specified insured banks or trust companies or savings banks or insured state or federal credit unions or be invested in one or more specified accounts in insured savings and loan associations . . . . The court may elect that the money be deposited in a high interest yield account such as an insured "savings certificate" or an insured "money market" account.

N.Y. C.P.L.R. § 1206(c).

birthday, on February 22, 2024, $12,174.64 in attorneys' fees, $833.63 as reimbursement for legal costs and expenses, and $157.83 to Blue Cross of California in settlement of medical liens. (Id. ¶¶ 10–11.)

8.       Benjamin Lazarus

Shortly after consuming Veggie Booty, Benjamin Lazarus ("Benjamin"), then eleven months old, experienced bloody diarrhea, vomiting, abdominal cramping, fever, chills and fatigue." (Aff. Infant Lazarus' Reps. ¶ 10 and Ex. 1, annexed thereto.)  Benjamin also developed a cough and congestion, which was noted by Dr. Janice Salem on June 13, 2007. (Aff. Infant Lazarus' Reps. ¶ 10.)  On June 15, 2007, Benjamin suffered a febrile seizure during which "his body jerked violently twice, followed by his eyes glazing over and rolling back in his head," which necessitated assistance from paramedics.  (Id. ¶ 11, Ex.1.)  One day later, Benjamin was taken to the ER after he suffered a bout of severe diarrhea and vomiting.  (Aff. Infant Lazarus' Reps. ¶ 13.)  On June 21, 2007, Benjamin's eating habits improved and by June 25, 2007, Dr. Salem acknowledged that Benjamin's diarrhea had subsided and that he was "doing fantastic."  (Id. ¶¶ 19–21, Ex. 1.)  Benjamin's guardians believe that he has recovered fully from his illness.  (Aff. Infant Lazarus' Reps. ¶ 22.)

Defendants have agreed to settle Benjamin's claims for $35,490.  (Aff'm Supp. Infant Settlement of Lazarus ¶ 10.)  The settlement package includes $25,501.07 towards the purchase of an annuity for the benefit of Benjamin, $8,500.36 in attorneys' fees, $1,001.50 as reimbursement for legal costs and expenses, and $487.07 to Blue Cross Blue Shield of Illinois in settlement of medical liens.  (Id. ¶¶ 10–11.)  The annuity commences payment on Benjamin's eighteenth birthday and will pay $7,500 on July 1, 2024, $10,000 on July 1, 2027, and $51,173.68 on July 1, 2029, with a rate of return of 5.37%.  (Aff. Infant Lazarus' Reps., Ex. 7.)

9. <u>Willow Bullen</u>

On June 11, 2007, Rebecca Bullen took her then eleven-month-old daughter, Willow Bullen ("Willow"), to visit Dr. Mark Nupen, who noted that Willow had a fever of 102.9°F and had experienced "bloody diarrhea beginning today." (Aff. Infant Bullen's Reps., Ex. 1.) Willow suffered additional symptoms of vomiting, fatigue, chills, and dehydration, (Aff. Infant Bullen's Reps. ¶ 10), while Dr. Shehbana Mahmood noted "some diaper rash." (Aff. Infant Bullen's Reps., Ex. 1.) To aid Willow's recovery, her mother, Rebecca Bullen, missed a week and a half of work. (Aff. Infant Bullen's Reps., Ex. 4 at 7.) Willow's diarrhea subsided on June 19, 2007, and her guardians believe that she recovered fully by early July 2007. (Aff. Infant Bullen's Reps. ¶ 13.)

Defendants have agreed to settle Willow's claims for $21,290. (Aff'm Supp. Infant Settlement of Bullen ¶ 10.) The settlement package includes $14,961 towards the purchase of an annuity for the benefit of Willow, $4,987.30 in attorneys' fees, $833.82 as reimbursement for legal costs and expenses, and $507 to Willow's guardians, Brian and Rebecca Bullen, for reimbursement of out-of-pocket expenses. (<u>Id.</u> ¶¶ 10–11.) The annuity is payable annually in the amount of $8,530.86, commencing on Willow's eighteenth birthday, July 3, 2024, and ending on July 3, 2027, with a rate of return of 5.18%. (Aff. Infant Bullen's Reps., Ex. 6.)

10. <u>Tilda McEvoy</u>

Tilda McEvoy ("Tilda"), then ten months old, became ill on April 28, 2007 after developing bloody diarrhea and a 103°F fever. (Aff. Infant McEvoy's Reps. ¶ 11 and Ex. 1, annexed thereto.) At the ER, Tilda's "stools were confirmed to be bloody and mucousy" and she "was provided IV fluids to prevent dehydration." (Aff. Infant McEvoy's Reps. ¶ 11.) Tilda's condition improved over the next several days and by May 6, 2007 her diarrhea had subsided

and her appetite returned.  (Id. ¶ 12.)  Tilda's guardians believe that she has recovered fully from her illness.  (Id. ¶ 14.)

Defendants have agreed to settle Tilda's claims for $17,050.  (Aff'm Supp. Infant Settlement of McEvoy ¶ 10.)  The settlement package includes $11,654.28 towards the purchase of an annuity for Tilda's benefit, $3,884.76 in attorneys' fees, $859.99 as reimbursement for legal costs and expenses, and $650.97 to Blue Cross of California in settlement of medical liens. (Id. ¶¶ 10–11.)  The annuity commences payment on Tilda's eighteenth birthday and will pay $5,000 on June 16, 2024, $7,500 on June 16, 2027, and $17,467.16 on June 16, 2029, with a rate of return of 5.27%.  (Aff. Infant McEvoy's Reps., Ex. 7.)

11.    Parker Mitchell

Parker Mitchell ("Parker"), then twenty-two months old, became ill on May 14, 2007, experiencing "diarrhea that very quickly became more and more frequent." (Aff. Infant Mitchell's Reps. ¶ 11 and Ex. 1, annexed thereto.)  Parker subsequently developed a 103°F fever and was "lifeless and out of sorts."  (Id. ¶ 13.)  During a May 22, 2007 visit, however, Dr. Vosberg noted that Parker's "diarrhea ha[d] resolved" and that his condition was "improving." (Aff. Infant Mitchell's Reps., Ex. 1.)  Parker's guardians attest that he was ill for a period of two weeks and that he is now fully recovered.  (Aff. Infant Mitchell's Reps. ¶ 16.)

Defendants have agreed to settle Parker's claims for $14,190.  (Aff'm Supp. Infant Settlement of Mitchell ¶ 10.)  The settlement package includes $9,945.24 towards the purchase of an annuity for the benefit of Parker, $3,315.08 in attorneys' fees, $754.68 as reimbursement for legal costs and expenses, and $175 to Cigna Healthcare in settlement of medical liens.  (Id. ¶¶ 10–11.)  The annuity is payable annually in the amount of $5,306.39, commencing on

Parker's eighteenth birthday, July 13, 2023, and ending on July13, 2026, with a rate of return of 5.07%. (Aff. Infant Mitchell's Reps., Ex. 7.)

DISCUSSION

I.    <u>Legal Standard</u>

Where a plaintiff is an infant, "[a] settlement must be reviewed by the Court to determine whether it is fair, whether the interests of the infant are protected, and whether the attorneys' fees sought are reasonable." <u>Doe v. Mattingly</u>, No. 06 CV 5761, 2007 WL 2362888, at *1 (E.D.N.Y. Aug. 14, 2007); <u>See also</u> N.Y. C.P.L.R. §§ 1205–1208; Loc. Civ. R. 83.2(a)(1) ("An action by or on behalf of an infant or incompetent shall not be settled or compromised, or voluntarily discontinued, dismissed or terminated, without leave of the court . . . The proceeding upon an application to settle or compromise such an action shall conform, as nearly as may be, to the New York State statute and rules, but the court, for cause shown, may dispense with any New York State requirement."). "In determining whether the settlement should be approved, the Court's role is to 'exercise the most jealous care that no injustice be done' to the infant." <u>Southerland v. City of New York</u>, No. CV-99-3329, 2006 U.S. Dist. LEXIS 53582, at *8 (E.D.N.Y. Aug. 2, 2006) (<u>quoting</u> <u>Dupont v. Southern Nat'l Bank of Houston</u>, 771 F.2d 874, 882 (5th Cir. 1985)) (additional quotation omitted).

"New York law provides detailed procedures to be followed before an infant's claim can be settled." <u>Southerland</u>, 2006 U.S. Dist. LEXIS 53582, at *8. One such procedure requires that the infant and his or her attorney "appear before the Court, unless their absence is excused for good cause." <u>Id.</u> (<u>citing</u> N.Y. C.P.L.R. § 1208(d)) (additional citation omitted). "In determining whether good cause [to excuse the infant's appearance] has been shown, the court will consider

-16-

whether the infant's appearance is necessary for a proper determination of settlement, and whether it would constitute a particular or unnecessary hardship if attendance is required." Linda J. v. Wharton, 594 N.Y.S.2d 971, 972 (N.Y. City Civ. Ct. 1992) (citation omitted); see also Bermudez v. Rogelio, 2005 NY Slip Op. 51213U, at *1 (N.Y. Civ. Ct. July 29, 2005) (considering the following factors in determining whether to excuse an infant's appearance for good cause: (1) the nature and extent of the injuries; (2) the permanency of the injuries; (3) the degree of recovery attested to by a physician; (4) the infant's age; (5) the amount of the settlement; and (6) the nature of the hardship in having the infant appear).

In the within action, the individual infant plaintiffs and their parents reside in various states throughout the country as well as in Canada. In addition, none of the infants have sustained any residual effects from the *Salmonella* illness each suffered, which would require the Court to personally view their injuries. Unlike cases in which the infant suffers a permanent injury or disability, this is not a case where "[i]t would be impossible for the court to evaluate the infant[s'] injuries without [their] personal apperance[s] . . . ." Linda J., 594 N.Y.S.2d at 972 (requiring infant's appearance where infant sustained "facial scarring," a "hyper-pigmentation on the face," "multiple diffuse facial tics," and a "depression to her left lateral thigh representing necrosis"). Rather, in cases such as this one, where "the infant[s] [have] made a full recovery from injuries that were not substantial and the amount of the settlement appears to be adequate to compensate [them] for such injuries," good cause exists to excuse the infants from being forced to travel to New York for appearance at a hearing. Bermudez, 2005 NY Slip Op. 51213U, at *2 (excusing infant's appearance where infant no longer resided in the United States and suffered "cervical and lumbosacral sprains and strains" from which he fully recovered).

II.    Fairness of the Settlement Amount

"There is no bright-line test for concluding that a particular settlement is fair." Stephen v. Target Corp., No. CV-08-338. 2009 WL 367623, at * 2 (E.D.N.Y. Feb. 12, 2009) (citing Newman v. Stein, 464 F.2d 689, 692–93 (2d Cir. 1972)).  Instead, a court must "'determin[e] whether a proposed settlement is fair, reasonable and adequate,' by comparing 'the terms of the compromise with the likely rewards of litigation.'"  Neilson v. Colgate-Palmolive Co., 199 F.3d 642, 654 (2d Cir. 1999) (quoting Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1079 (2d Cir. 1995)) (alteration in original).  "A strong presumption exists that a settlement is fair and reasonable where '(i) the settlement is not collusive but was reached after arm's length negotiation; (ii) the proponents have counsel experienced in similar cases; [and] (iii) there has been sufficient discovery to enable counsel to act intelligently . . . .'"  Stephen, 2009 WL 367623, at *2  (quoting Ross v. A.H. Robins Co., Inc., 700 F. Supp. 682, 683 (S.D.N.Y. 1988)) (alteration in original); see also Lowell ex rel. Lowell v. Hall, No. 05 CV 4978, 2007 WL 1434998, at *2 (E.D.N.Y. May 14, 2007) (finding that mediation is evidence against collusion).

Other relevant factors in considering a proposed settlement include: (1) "the complexity, expense, and likely duration of the litigation;" (2) the extent to which discovery has been completed; (3) the risks of litigation with respect to both liability and damages; (4) "the defendants' ability to withstand a greater judgment;" and, (5) the reasonableness of the proposed settlement amount "compared to the best possible recovery and in light of all the litigation risks."  Jurdine ex rel. Jurdine v. City of New York, No. 07-CV-2915, 2008 WL 974650, at *3 (E.D.N.Y. Apr. 8, 2008) (citing City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974)).  In applying these factors, the court need "not decide the merits of the case or resolve unsettled legal questions."  Carson v.  American Brands, Inc., 450 U.S. 79, 88 n.14 (1981).  In

<u>Jurdine ex rel. Jurdine v. City of New York</u>, No. 07-CV-2915, 2008 WL 974650 (E.D.N.Y. Apr. 8, 2008), the court approved a $10,000 infant compromise to prevent the parties from incurring significant litigation expenses and in light of the difficulty the infant's guardian would have in establishing defendants' liability. <u>See</u> <u>id.</u> at *4. The court also recognized the utility of settlement in infant personal injury cases where a guardian is unable to point to any "significant injuries-physical, psychological, or emotional" in establishing damages. <u>Id.</u> at *4. Furthermore, under New York law, courts give deference to a parent or guardian's opinion on the fairness of a proposed settlement. <u>See</u> <u>Sabater v. Lead Industries Ass'n Inc.</u>, No. 00 CIV. 8026, 2001 WL 1111505, at *3–4 (S.D.N.Y. Sept. 21, 2001); <u>Stahl v. Rhee</u>, 643 N.Y.S.2d 148, 153 (2d Dept. 1996) (stating that "[i]n a case where reasonable minds may legitimately differ, the judgment of the infant's natural guardian should prevail.").

Applying the criteria set forth above, the proposed settlement appears to be fair and reasonable. First, the parties have agreed to the proposed settlement through negotiation, which sufficiently dispels any finding of collusion. <u>See</u> <u>Lowell</u>, 2007 WL 1434998, at *2. Second, Plaintiffs' counsel, Marler Clark, "regularly litigates food borne illness claims" and has expertise unique among law firms in the field. (Aff. Supp. Infant Settlement of Bullen ¶ 9). Third, discovery has produced substantial evidence of causation, both demonstrating Defendants' likely culpability for the Veggie Booty *Salmonella* outbreak and tying the infants' salmonellosis, which developed for each infant within the "expected incubation period" after consuming Veggie Booty, to the outbreak originating at Robert's Gourmet. Fourth, through settlement, Plaintiffs are avoiding the risk that they will achieve no recovery. Finally, as in <u>Jurdine</u>, the settlement awards in the present action are reasonable given the guardians' inability to point definitively to any long-term injuries, physical pain, or suffering. <u>See</u> <u>Jurdine</u>, 2008 WL 974650, at * 4.

Accordingly, I find that the proposed settlement is both fair and reasonable.

III.     Investment and Maintenance of the Infants' Funds

In approving an infant settlement, the court may order parties to establish a structured settlement annuity providing for the payment of an award in several installments, commencing when the plaintiff turns eighteen.  N.Y. C.P.L.R. § 1206.  The present value of the settlement annuity is calculated by discounting the value of the future award payments.  See Oliveri v. Delta Steamship Lines, Inc., 849 F.2d 742, 745–746 (2d. Cir. 1988).  "Discounting" is necessary to account both for inflation, the tendency for money to decrease in purchasing power over time, and the plaintiffs' foregone opportunity to invest and earn interest on a payment received now instead of in the future.  Oliveri, 849 F.2d at 745-46.

Courts have consistently chosen the yield on United States Treasury securities as the discount rate for determining awards in personal injury suits, see Tassone v. Mid-Valley Oil Co., Inc., 773 N.Y.S.2d 744, 747 (3d Dept. 2004) (citing cases), selecting the yield corresponding to the Treasury obligation(s) which become due closest to the date of the future settlement payment specified by the court.  See Liriano v. Hobart Corp., 960 F. Supp. 43, 45–46 (S.D.N.Y 1997) (selecting rates on three-year, ten-year, and thirty-year Treasury securities based on approximate time horizon for incurring medical expenses, lost wages and pain and suffering); see also Underwood v. B-E Holdings, Inc., 269 F. Supp. 2d 125, 137 (W.D.N.Y. 2003) ("blending" current rates on ten and twenty-year Treasury bonds to approximate discount rate for fourteen-year settlement period); Abellard v. New York City Health & Hosps. Corp., 694 N.Y.S.2d 163, 164 (2d Dep't 1999) (selecting rate on twenty-year bond as it corresponded to tenure of plaintiffs' custodial care).  When doubt exists as to the correct discount rate, however, courts

have erred toward selecting the lower rate earned on safer, more conservative investments. <u>See</u> <u>Wright v. Maersk Line, Ltd.</u>, No. 99 Civ. 11282, 2003 WL 470335, at *2 (S.D.N.Y. Feb. 24, 2003) (choosing 2% rate over 3% rate "because it was based on more conservative investments"); <u>Tassone</u>, 773 N.Y.S.2d at 747 (adopting lower court's blended 5.15% rate in favor of 5.577% rate on current thirty-year bond).

This Court can easily approximate a discount rate for the annuities by blending the ten and thirty-year Treasury yields because the structured settlement proposed for each infant specifies the exact date for every future annuity payment.[8] Since the average rate of return on the infants' proposed annuities is 5.25%, and each annuity will yield over 5%, <u>see</u> discussion <u>supra</u> at 6–16 regarding the Infant Plantiffs, I recommend that the court approve the proposed structured settlements.


IV.     <u>Attorney's Fees and Expenses</u>

Counsel representing plaintiffs in infant compromises can only receive contingency fees - fees dependent upon the success of litigation - with the court's approval. <u>See</u> N.Y. Jud. Law § 474. "[T]he criterion for determining the appropriate amount of attorneys' fees to be awarded in the context of an infant compromise proceeding is 'suitable compensation for the attorney for his service therein . . . [on] behalf of the said infant.'" <u>Doe</u>, 2007 WL 2362888, at *3 (<u>quoting</u> <u>Werner v. Levine</u>, 276 N.Y.S.2d 269, 271 (Sup. Ct. 1967)). To determine "suitable compensation," courts must consider the value of an attorney's legal services based upon "proof from either the attorney or guardian by affidavit, [and] reference or the examination of witnesses

---

[8] The sole exception is Boston Mochi, whose settlement package does not include a structured settlement. This settlement amount is also approved, provided that the settlement proceeds - $36,523.90 - are invested in an "insured bank[]" account and deposited in a "high interest yield . . . savings certificate" or "money market account" in compliance with New York C.P.L.R. ¶ 1206(c).

before the said court, judge or surrogate . . . ."  N.Y. Jud. Law § 474.  While the guardians ad litem herein have agreed to the proposed settlements, "any agreement of the guardian is advisory only."  See Werner, 276 N.Y.S.2d at 271.

In White v. DaimlerChrysler Corp., 871 N.Y.S.2d 170 (2d Dept. 2008), the court denied contingent attorney's fees in a class action where "the core inquiries into causation and liability required no more effort than that necessary to litigate the action on behalf of only one injured party."  Id. at 174 (noting additionally that "the requested attorney's fee of one third of the recovery . . . represent[ed] the upper-limit, in general, of what is deemed reasonable under the rules of this Court." ).  However, in Doe v. Mattingly, No. 06 CV 5761, 2007 WL 2362888, at *1 (E.D.N.Y. Aug. 14, 2007), the court awarded plaintiff's counsel 36.36% of the net settlement after considering detailed records listing the attorneys who worked on the case and their hourly rates, along with the number of hours worked and a description of the services provided.  See id. at *3–4 (noting that counsel's requested contingent fee of 40% of the net settlement already represented a significant 50% reduction of hours billed).

Additionally, litigation costs and expenses must be deducted from the gross settlement amount before determining attorney's fees in infant compromises not relating to medical malpractice.  See e.g. Everett v. Bazilme, No. CV 06-0269, 2007 WL 1876591, at * 4 (E.D.N.Y. June 28, 2007) (awarding exactly one-third of the settlement amount less expenses in suit over automobile accident); Allstate v. Ins. Co. v. Williams, No. 04 CV 4675, 2006 WL 2711538, at *3 n.2 (E.D.N.Y. Sept. 21, 2006) (approving settlement where attorney fees were calculated after subtracting expenses from the settlement amount in suit involving lead poisoning); Tsotesi v. Bd. of Educ., No. 02 Civ. 7809, 2003 WL 22006936, at *1-2 (S.D.N.Y. Aug. 25, 2003) (requesting renewed application for contingency fees of up to one-third of the agreed gross settlement minus

expenses in suit involving school-related injury). In this court, "any party seeking to recover costs shall file with the clerk a request to tax costs annexing a bill of costs and indicating the date and time of taxation." Loc. Civ. R. 54.1; see also Mateo v. United States., No. 06 Civ. 2647, 2008 WL 3166974, at *5 (S.D.N.Y. Aug. 6, 2008) ("Where an attorney fails to provide suitable documentation to substantiate the costs incurred, a court may decline to award any costs.").

Marler Clark and supporting counsel's contingent fee agreements and request for legal costs are reasonable. The 25% fee is correctly calculated based on the net, as opposed to gross, settlement amount, and is also well below the accepted 33.33% fee limit. Furthermore, Marler Clark's reduced fee indicates an understanding that it should not receive the maximum permissible fee for having applied the same legal proof to multiple plaintiffs in this class action. Finally, Marler Clark provides detailed reports of the legal costs incurred in the within proceedings in conformance with Local Civil Rule 54.1 and the relevant case law. (Affs. Infant Bullen's, Kramer's and Mochi's Reps., Ex. 7; Affs. Infant Allen's, Aldredge's, Charley's, Lazarus', McEvoy's, McLaughlin's, Mitchell's, Tones-Svendsen's Reps., Ex 8.)

Based on the foregoing, I recommend that the Court approve Marler Clark and supporting counsel's contingency legal fees and applications for costs and expenses.


V.      Guardian's Costs and Expenses

A court may grant "reasonable compensation" for services rendered by a guardian ad litem upon submission of an affidavit "showing the services rendered." N.Y. C.P.L.R. § 1204. The court monitors the distribution of funds to ensure both "that the interests of the infant are protected" and that the funds are not used to "supplement or substitute for the financial obligations of the parent to [his or] her child." Star S. v. Clark, No. 01-CV-6871, 2009 WL

81340, at *1 (E.D.N.Y. Jan. 9, 2009) (holding that, absent extraordinary circumstances, parent was not entitled to a portion of infant's award to pay for clothing and furniture, since these expenses "generally paid for by a child's parents").

The proposed settlement package for six of the infant plaintiffs contains a payment to their guardians for costs and expenses.[9] Three of the requested awards are for more than $1,000, and one, the award to Jake Charley's guardians, is for more than $20,000. However, none of the Plaintiffs' affidavits include a statement "showing services rendered" to the respective infants with respect to the *Salmonella* infection. Since the infants have all fully recovered, there is no anticipated cost for "future care." Since there is no support provided to substantiate these amounts payable to the parents, such costs should not be approved. Instead, these monies should be used to increase the amount of each infant's annuity payment, provided that the annuity purchased has the same rate of return as that discussed herein.

### RECOMMENDATION

For the foregoing reasons, I recommend that the proposed infant settlements be approved, with the exception of the six infants whose parents seek to be provided reimbursement for unsubstantiated future care and uninsured medical costs arising from the infant's *Salmonella* illness. As to these six infants, I recommend that the amount sought for future care and out-of-pocket expenses be allocated to increase the amount of the infant's annuity at the same rate of return as proposed for such infant.

---

[9] Those plaintiffs whose guardians are claiming out-of-pocket expenses include Jake Charley, Lucy McLaughlin, Julia Kramer, Matisee Aldredge, Xavier Allen and Willow Bullen.

<u>OBJECTIONS TO THIS REPORT AND RECOMMENDATION</u>

Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a copy to the undersigned within ten (10) days of receipt of this report. Failure to file objections within ten (10) days will preclude further appellate review of the District Court's order. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), and 72(b); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822 (1994); Frank v. Johnson, 968 F.2d 298 (2d Cir. 1992), cert. denied, 506 U.S. 1038 (1992); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).


**SO ORDERED:**

Dated: Central Islip, New York
        August 12, 2009

/s/ E. Thomas Boyle
E. THOMAS BOYLE
United States Magistrate Judge